UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT HAITH, derivatively on behalf of ACCRETIVE HEALTH, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>EDGAR M. BRONFMAN JR., J. MICHAEL CLINE, STEVEN N. KAPLAN, STANLEY N. LOGAN, DENIS J. NAYDEN, ARTHUR H. SPIEGEL III, MARY A. TOLAN, JOHN T. STATON, and MARK A. WOLFSON, and ACCRETIVE HEALTH, INC., nominal defendant,<br><br>Defendants. | 12 C 6781<br><br>Judge Feinerman |
| JEFFREY GOODWIN, derivatively on behalf of ACCRETIVE HEALTH, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>EDGAR M. BRONFMAN JR., J. MICHAEL CLINE, STEVEN N. KAPLAN, STANLEY N. LOGAN, DENIS J. NAYDEN, GEORGE P. SHULTZ, ARTHUR H. SPIEGEL III, MARY A. TOLAN, MARK A. WOLFSON, and JOHN T. STATON, and ACCRETIVE HEALTH, INC., nominal defendant,<br><br>Defendants. | 12 C 6798<br><br>Judge Feinerman |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Robert Haith and Jeffrey Goodwin brought these state law shareholder derivative actions on behalf of Accretive Health, Inc., a Delaware corporation, in the Circuit Court of Cook County, Illinois. Doc. 1-1 (12 C 6781); Doc. 1-1 (12 C 6798). Although the suits have not been consolidated, they are materially identical for purposes of this opinion. The

1

individual defendants, who are directors and officers of Accretive Health, removed the suits to federal court under 28 U.S.C. §§ 1441. Doc. 1 (12 C 6781); Doc. 1 (12 C 6798). Defendants do not assert that the case falls within the federal courts' diversity jurisdiction, *see* 28 U.S.C. § 1332, or that Plaintiffs' claims were created by federal law. Rather, they contend that the claims, although created by state law, fall within the federal courts' "arising under" jurisdiction, 28 U.S.C. § 1331, under the standard set forth in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 314 (2005). Plaintiffs disagree, and each has moved to remand his case to state court under 28 U.S.C. § 1447(c). Doc. 17 (12 C 6781); Doc. 14 (12 C 6798). The motions are granted, but Plaintiffs' request for an award of attorney fees and costs is denied.

## Background

Haith's and Goodwin's complaints make substantially similar factual allegations and legal claims. Plaintiffs are Accretive Health shareholders and were shareholders at all relevant times. Doc. 1-1 (12 C 6781) at ¶ 13; Doc. 1-1 (12 C 6798) at ¶ 11. Plaintiffs allege that Defendants made numerous public statements, in press releases and SEC filings, that made false or misleading statements and omissions about Accretive Health's operations and financial prospects. Doc. 1-1 (12 C 6781) at ¶¶ 3, 8, 38, 40, 42, 49, 54; Doc. 1-1 (12 C 6798) at ¶¶ 3, 28-31, 33-34, 36-37, 43. In particular, Plaintiffs allege that Defendants concealed their knowledge that Accretive Health was violating consumer privacy standards imposed by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d *et seq*., the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), 42 U.S.C. § 17921 *et seq*., state consumer protection laws, and its contract with a large client. Doc. 1-1 (12 C 6781) at ¶ 54; Doc. 1-1 (12 C 6798) at ¶ 43. Plaintiffs allege that Defendants' alleged

misstatements and omissions had the effect of artificially inflating the price of Accretive Health's stock and then, when the truth came out, of causing that price to fall substantially, to the detriment of shareholders.  Doc. 1-1 (12 C 6781) at ¶¶ 5, 7, 9, 50; Doc. 1-1 (12 C 6798) at ¶¶ 4, 6, 32, 38-39, 42.  Plaintiffs further allege that Accretive Health's violations led the Attorney General of Minnesota to file a lawsuit against it and to release a report detailing its unsavory debt collection practices; led the *New York Times* to publish an article that put the company's debt collection practices in bad odor, *see* Jessica Silver-Greenberg, "Debt Collector Is Faulted for Tough Tactics in Hospitals," *New York Times* (April 24, 2012); led the Minnesota Department of Commerce to temporarily suspend the company's Minnesota debt collection license; and led a group of plaintiffs to sue the company for violating federal securities law.  Doc. 1-1 (12 C 6781) at ¶¶ 4, 6, 9, 44-46, 51-52; Doc. 1-1 (12 C 6798) at ¶¶ 35, 40-41.

Because Accretive Health is a Delaware corporation, the internal affairs doctrine provides that Delaware law governs Plaintiffs' claims.  *See Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 576 (7th Cir. 1996).  Haith asserts three counts of breach of fiduciary duty, one count of unjust enrichment, one count of abuse of control, one count of gross mismanagement, and one count of waste of corporate assets.  Doc. 1-1 (12 C 6781) at ¶¶ 94-123.  Goodwin asserts a single count of breach of fiduciary duty.  Doc. 1-1 (12 C 6798) at ¶¶ 83-88.  Neither Haith nor Goodwin made a demand on Accretive Health's Board of Directors to bring this action against Defendants; both allege that demand would be futile and thus is excused.  Doc. 1-1 (12 C 6781) at ¶¶ 59-93; Doc. 1-1 (12 C 6798) at ¶¶ 64-82; *see Braddock v. Zimmerman*, 906 A.2d 776, 784-85 (Del. 2006) (describing the demand futility doctrine); *In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795, 803-04 (7th Cir. 2003).  One other derivative suit alleging essentially the same misconduct by the same group of defendants, and also alleging demand futility, is pending before

3

the undersigned judge. *Marvin H. Maurras Revocable Trust v. Bronfman*, 12 C 3395 (N.D. Ill. filed May 3, 2012). Unlike Haith's and Goodwin's suits, the *Maurras Trust* suit falls within the court's diversity jurisdiction. Defendants in *Maurras Trust* there have moved to dismiss on the ground, among others, that the plaintiffs there did not adequately allege demand futility under Federal Rule of Civil Procedure 23.1. *Id.*, Doc. 93.

**Discussion**

I.  **Whether Plaintiffs' Claims "Arise Under" Federal Law**

As mentioned, Defendants contend that Haith's and Goodwin's suits fall within the federal courts' "arising under" jurisdiction, 28 U.S.C. § 1331. *Grable* held that "arising under" jurisdiction extends to state law claims that "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314. Defendants assert that Plaintiffs' claims necessarily raise the following issues of federal law: (1) whether Accretive Health violated two federal privacy statutes, the HIPAA and the HITECH Act; (2) whether Accretive Health violated the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, as incorporated into Minnesota law; and (3) whether Defendants made or caused to be made misleading statements and omissions in SEC filings, in violation of federal securities law. *Grable* jurisdiction does not apply for at least two reasons: none of the federal issues ostensibly raised by Plaintiffs' state law claims is "substantial," and entertaining this case in federal court would disrupt the congressionally approved balance of federal and state judicial responsibilities.

The Supreme Court clarified *Grable*'s "substantial issue" requirement in *Gunn v. Minton*, No. 11-1118, 568 U.S. ___ (U.S. Feb. 20, 2013). *Gunn* reaffirmed the principle, articulated in

*Grable*, that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, slip op. at 6. With respect to the third element, there is no doubt that the federal issues noted above are substantial to the parties in these cases, in the sense that they could decide the outcome of this litigation. As *Gunn* notes, however, "that will *always* be true when the state claim 'necessarily raise[s]' a disputed federal issue." *Id*. at 8. Accordingly, instead of considering whether an issue is substantial to the parties, "[t]he substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole." *Ibid*. *Gunn* provides two examples of state law claims that did raise "substantial" federal issues:

> In *Grable* itself, for example, the Internal Revenue Service had seized property from the plaintiff and sold it to satisfy the plaintiff's federal tax delinquency. Five years later, the plaintiff filed a state law quiet title action against the third party that had purchased the property, alleging that the IRS had failed to comply with certain federally imposed notice requirements, so that the seizure and sale were invalid. In holding that the case arose under federal law, we primarily focused not on the interests of the litigants themselves, but rather on the broader significance of the notice question for the Federal Government. We emphasized the Government's strong interest in being able to recover delinquent taxes through seizure and sale of property, which in turn required clear terms of notice to allow buyers to satisfy themselves that the Service has touched the bases necessary for good title. The Government's direct interest in the availability of a federal forum to vindicate its own administrative action made the question an important issue of federal law that sensibly belonged in a federal court.

> A second illustration of the sort of substantiality we require comes from *Smith v. Kansas City Title & Trust Co.*, 255 U. S. 180 (1921), which *Grable* described as the classic example of a state claim arising under federal law. In *Smith*, the plaintiff argued that the defendant bank could not purchase certain bonds issued by the Federal Government because the Government had acted unconstitutionally in issuing them. We held that the case arose under federal law, because the decision depends upon the determination of the constitutional validity of an act of Congress which is directly drawn in question. Again, the relevant point was not the importance of the question to the parties alone but rather the importance more generally of a

5

>determination that the Government securities were issued under an unconstitutional law, and hence of no validity.

*Gunn*, slip op. at 8-9 (citations, brackets, and internal quotation marks omitted).

*Gunn* itself provides a contrasting case. The plaintiff, Vernon Minton, was an inventor who had hired the defendants to represent him in a federal court patent suit. *Id*. at 1-2. The federal court ruled that Minton's patent was invalid and then, when Minton's attorneys sought reconsideration based on a new argument regarding validity, the court held that Minton had forfeited the argument by raising it too late. *Id*. at 2. Minton then brought a state law attorney malpractice suit against his patent attorneys, alleging that their untimely submission of the new argument had cost him his patent. *Ibid*. A dispositive question presented by Minton's malpractice suit was whether the forfeited argument would have succeeded on the merits; if it would not have succeeded, then the defendants' forfeiture of the argument did not cost Minton his patent and thus caused him no harm. *Id*. at 2-3. This question necessarily raised a disputed issue of federal law, since federal law governs the validity of United States patents. *Id*. at 3-4, 7. The question before the Supreme Court was whether all this made Minton's state law malpractice claim fall within the "arising under" jurisdiction under *Grable*.

The Court held that it did not. *Id*. at 6. Although Minton's suit necessarily raised a federal question that was actually disputed, the Court concluded that the patent law issue was "not substantial in the relevant sense" of being significant not only to the individual litigants, but also "to the federal system as a whole." *Id*. at 8, 12. In so holding, the Court made several points. First, the state courts' decision on the merits of the forfeited federal patent law argument would "not change the real-world result of the prior patent litigation. Minton's patent will remain invalid." *Id*. at 9-10. Second, the Court noted that allowing state court resolution of federal patent law issues under such circumstances would not undermine the federal interest in

6

the development of a uniform body of patent law, which interest Congress has asserted by vesting the federal district courts with exclusive jurisdiction over suits arising under the patent laws, because most questions of patent law would continue to be decided by the federal judiciary and state court rulings on patent issues would not bind the federal courts. *Id*. at 10 (citing *Tafflin v. Levitt*, 493 U.S. 455, 465 (1990)). Third, the Court explained that any preclusive effect that the state courts' determination might have "would be limited to the parties and patents that had been before the state court" and that "[s]uch 'fact-bound and situation-specific' effects are not sufficient to establish federal arising under jurisdiction." *Id*. at 10-11 (quoting *Empire HealthChoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701 (2006)). Fourth, the Court rejected the argument that cases raising patent issues belong in federal court due to the federal courts' greater expertise in patent law, reasoning that "the possibility that a state court will incorrectly resolve a state claim is not, by itself, enough to trigger the federal courts' exclusive patent jurisdiction, even if the potential error finds its root in a misunderstanding of patent law." *Id*. at 11-12. The Court concluded that "[t]here is no doubt that resolution of a patent issue in the context of a state legal malpractice action can be vitally important to the particular parties in that case. But something more, demonstrating that the question is significant to the federal system as a whole, is needed. That is missing here." *Id*. at 12.

The same holds for these cases. As *Gunn* makes clear, the fact that Plaintiffs' state law claims turn in part on the application of federal laws—the HIPAA, the HITECH Act, the FDCPA, and the federal securities laws—is not enough to satisfy *Grable*. Defendants suggest that the federal issues are substantial to the federal system as a whole because resolving Plaintiffs' state law claims will require the state courts to perform "the analysis and interpretation of dozens of regulatory provisions promulgated under these statutes, most or all of which have

7

never previously been adjudicated." Doc. 27 (12 C 6798) at 16. (Defendants' brief in Case No. 12 C 6781 is nearly identical to their brief in Case No. 12 C 6798, so the court will cite only the latter.) That may be so, but *Gunn* answers that argument: the state court's rulings will not bind the federal courts in future cases and will have no preclusive effect beyond the parties to the state litigation, and the possibility that the parties might be subjected to a state court's incorrect interpretation of federal law does not suffice to create "arising under" jurisdiction. *Gunn*, slip op. at 10, 12. The state court's resolution of those federal issues, in other words, will not have effects beyond the parties to these suits and certainly could not pose a threat to the workings of the federal system as a whole.

These cases therefore are unlike *Grable*, in which the state court, by accepting the plaintiff's argument that the Internal Revenue Service's seizure of his land had violated federal law, might have jeopardized the IRS's ability to recover delinquent taxes by seizing and selling the delinquent's property; such a ruling would likely have forced the IRS to reimburse the defendant for his lost property, and may also have made it more difficult for the IRS to sell property in the future because potential buyers would fear losing it to the delinquent taxpayer in a quiet title action. *Gunn*, slip op. at 8-9; *see also Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (7th Cir. 2007) ("The [*Grable*] Court thought a federal forum especially appropriate for contests arising from a federal agency's performance of duties under federal law, doubly so given the effect on the federal Treasury."). Nor are the federal issues here akin to the issue in *Smith*, where the state court would have harmed the federal government's interest in issuing securities that would be treated as valid, thereby endangering federal revenues, had it accepted the plaintiff's contention that the securities had been issued pursuant to an unconstitutional federal law and that the defendant bank was therefore unable to purchase them. *Gunn*, slip op. at 9.

These cases, rather, are much like *Gunn*: right or wrong, the state courts' resolution of the federal issues will not have a substantial effect beyond the parties themselves. At oral argument on February 25, 2013, Defendants sought to distinguish *Gunn* on the ground that the federal issue there arose in the context of a state malpractice law "case-within-a-case"—in which the malpractice court must decide whether the patent court would have accepted the forfeited argument had it been asserted in a timely manner—while the federal issues here are perhaps raised more directly by the state law claims. *Gunn* cannot plausibly be read to apply only to the "case-within-a-case" scenario. The reach of Supreme Court decisions are not limited to the particular facts and circumstances presented in the case being decided; lower courts must apply the reasoning of those decisions even to cases that are factually dissimilar. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) ("This is the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings."). Even if these cases were factually distinguishable from *Gunn*, the reasoning of *Gunn* clearly requires that federal issues raised by state law claims be "substantial" in a sense that, as discussed above, the federal issues raised here are not.

At any rate, the way in which Plaintiffs' claims raise federal issues is very similar to the way that the malpractice claim in *Gunn* raised federal patent law issues. The federal issues in *Gunn* and here are raised not for their own sake but as a predicate to a state law claim: Minton could not win his state malpractice action without showing that the federal patent law argument forfeited by his attorneys was meritorious, and Plaintiffs here cannot win their state derivative suits without showing that Defendants failed to prevent or publicly disclose some wrongdoing by Accretive Health, with that wrongdoing potentially taking the form of violations of federal law.

9

Suppose that the Illinois courts determine that Defendants or Accretive Health indeed violated the HIPAA, the HITECH Act, the FDCPA, or the federal securities laws, and that Defendants therefore breached duties they owed to Accretive Health's shareholders, rendering them liable under Delaware law. That conclusion would not render Defendants or Accretive Health liable for the underlying violations of federal law or otherwise alter the result of the Minnesota Attorney General's enforcement action or any other action that may have been brought under federal law. Even if the state courts' decision could be asserted against Defendants or Accretive Health by way of nonmutual collateral estoppel, that would not distinguish this suit from *Gunn*, in which the Court held that the possibility that "a state court's case-within-a-case adjudication may be preclusive under some circumstances" did not render the underlying federal issue "substantial" under *Grable*. *Gunn*, slip op. at 11.

*Gunn* also applied the fourth element of *Grable*, which asks whether the federal issue raised by the state law claim is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id*. at 6. *Gunn* held that Minton's malpractice suit failed this requirement because, while the suit did not present a substantial federal question, "[t]he States … have 'a special responsibility for maintaining standards among members of the licensed professions.'" *Id*. at 12 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978)). Because the States have traditionally regulated the legal profession, the Court concluded that "[w]e have no reason to suppose that Congress—in establishing exclusive federal jurisdiction over patent cases—meant to bar from state courts state legal malpractice claims simply because they require resolution of a hypothetical patent issue." *Ibid*.

Similar logic applies to this case. Shareholder derivative suits have traditionally been governed by state corporate law. Under the corporate law of Delaware and other States, one duty

10

that directors owe to shareholders is the duty to prevent the corporation from violating other laws, state or federal, and thereby incurring liability that could harm shareholders by decreasing the value of the corporation's stock. *See South v. Baker*, __ A.3d __, 2012 WL 6114952, at *1 (Del. Ch. Sept. 25, 2012) ("directors can be held liable under [*In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996)] for knowingly causing or consciously permitting the corporation to violate positive law, or for failing utterly to attempt to establish a reporting system or other oversight mechanism to monitor the corporation's legal compliance"). Thus, a corporation's violation of federal laws such as the HIPAA, the HITECH Act, the FDCPA, and the securities laws can be a predicate to a state law derivative action. There is no reason to suppose, however, that in passing those laws to regulate patient privacy, debt collection practices, and the issuance and trading of securities, Congress also intended to bring derivative claims based on violations of those laws into the federal courts and thus upset the traditional relegation of derivative actions to state courts—absent some other source of federal jurisdiction, such as diversity, as in *Maurras Trust*.

For these reasons, Plaintiffs' claims do not satisfy the third and fourth requirements of *Grable*, and they therefore do not fall within the "arising under" jurisdiction of § 1331.

## II. Whether The Court Should Defer Decision on the Motion to Remand and First Consider Whether Plaintiffs Adequately Alleged Demand Futility Under Rule 23.1

Defendants contend that this court should not remand these suits to state court, but instead should first decide, as a "threshold" matter, whether the suits should be dismissed for failure to adequately allege demand futility under Rule 23.1. Doc. 35 (12 C 6781); Doc. 33 (12 C 6798); *see* Fed. R. Civ. P. 23.1(b)(3) (providing that a complaint in a derivative action "must … state with particularity (A) any effort by the plaintiff to obtain the desired action from the directors …; and (B) the reasons for not obtaining the action or not making the effort"); *In re*

*Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d at 807 ("The two-pronged test in *Aronson* [] provides that demand futility is established if, accepting the well-pleaded facts as true, the alleged particularized facts raise a reasonable doubt that either (1) the directors are disinterested or independent or (2) the challenged transaction was the product of a valid exercise of the directors' business judgment."). Defendants speak of the demand futility issue as one of "standing": if Plaintiffs did not make a pre-suit demand on the Accretive Health board and cannot show that the demand futility doctrine excused them from doing so, Defendants say, then Plaintiffs lack "standing" to bring these derivative actions. Doc. 35 (12 C 6781) at 2, 4, 6; Doc. 33 (12 C 6798) at 2, 4, 6.

If the demand issue were truly a question of "standing" within the meaning of Article III of the Federal Constitution, then the issue would go to the court's subject matter jurisdiction and would present a classic threshold issue that could be decided prior to or instead of the *Grable* issue. *See Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996) ("standing … is jurisdictional"). But the demand requirement does not go to Article III standing, and thus does not give rise to a question of subject matter jurisdiction. If Plaintiffs' substantive allegations are true, they have suffered financial loss that constitutes injury-in-fact, that was caused by Defendants' actions, and that could be redressed by the relief they seek. *See Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010) (to establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling"). It necessarily follows that Plaintiffs have Article III standing, regardless of whether they have adequately alleged demand futility. *See In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1237 (9th Cir. 2008) ("Federal Rule of Civil Procedure 23.1's pleading requirement does not directly implicate subject matter jurisdiction"); *Plumbers & Pipefitters*

*Local 572 Pension Fund v. Cook*, 2004 WL 5349589, at *2 (S.D. Ohio Sept. 22, 2004) (holding that a plaintiff's failure to satisfy Rule 23.1's pleading requirement does not deprive the federal court of subject matter jurisdiction); *see also Rawroof v. Texor Petrol. Co.*, 521 F.3d 750, 756-57 (7th Cir. 2008) (distinguishing between Article III's standing requirement and the real party in interest requirement of Rule 17(a)); *Freed v. JPMorgan Chase Bank, N.A.*, 2012 WL 3307091, at *5 (N.D. Ill. Aug. 13, 2012) (same). Even the decision upon which Defendants principally rely recognizes that the demand requirement does not implicate Article III. *See Potter v. Hughes*, 546 F.3d 1051, 1055 (9th Cir. 2008) (deeming the plaintiff's compliance with Rule 23.1 "an issue of state statutory standing," as distinct from an "Article III issue[]").

Because the demand futility issue does not implicate subject matter jurisdiction or personal jurisdiction, the order of battle that Defendants propose—decide the demand futility issue before the *Grable* issue—might contravene the rule of *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), that "[w]ithout jurisdiction the court cannot proceed at all in any cause." *Id*. at 94. This is not entirely clear; as Defendants correctly point out, the Supreme Court has carved a narrow exception to the rule that subject matter jurisdiction must be resolved first, holding that "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (internal quotation marks omitted); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) ("We hold that in cases removed from state court to federal court, as in cases originating in federal court, there is no unyielding jurisdictional hierarchy."). Recognized "threshold grounds" upon which a federal court may dispose of a case without first considering subject matter jurisdiction include dismissal for lack of personal jurisdiction, abstention pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), dismissal under *Totten v. United States*, 92 U.S. 105

(1876), transfer under 28 U.S.C. § 1404(a), and dismissal under the doctrine of *forum non conveniens*. *See Sinochem*, 549 U.S. at 431-32; *In re LimitNone, LLC*, 551 F.3d 572, 576 (7th Cir. 2008).

It is an open question, at least in this Circuit, whether a derivative plaintiff's failure to adequately plead demand futility is among the "threshold grounds" that a court can address before reaching subject matter jurisdiction. A divided Ninth Circuit panel and a federal district judge in New York have held that compliance with Rule 23.1 is a "threshold ground" under *Sinochem*. *See Potter*, 546 F.3d at 1055-56 ("In this case, the issue of whether Potter satisfied the demand pleading requirements of Rule 23.1 is 'logically antecedent' to the issue of whether we have jurisdiction over this action."); *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, __ F. Supp. 2d __, 2013 WL 525158, at *5-7 (S.D.N.Y. Feb. 13, 2013). Dissenting in *Potter*, Judge Ikuta made a very strong case that compliance with Rule 23.1 is not an appropriate threshold ground under *Sinochem*. *See Potter*, 546 F.3d at 1060-64 (Ikuta, J., dissenting).

There is no need to take sides here; even if a derivative plaintiff's compliance with Rule 23.1 were among the "threshold grounds" that *Sinochem* allows a federal court to address before resolving subject matter jurisdiction, it would not be appropriate to do so here given the particular facts and circumstances of these cases. In recognizing that courts may decide non-jurisdictional threshold issues without first considering subject matter or personal jurisdiction, *Sinochem* makes clear that this should be the exception rather than the rule:

> If … a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground. In the mine run of cases, jurisdiction will involve no arduous inquiry and both judicial economy and the consideration ordinarily accorded the plaintiff's choice of forum should impel the federal court to dispose of those issues first.

549 U.S. at 436 (citations, brackets, and internal quotation marks omitted).

In these cases, the jurisdictional issue presented by *Grable* is not a heavy lift, especially after *Gunn*. The demand futility issue, by contrast, does not have an obvious resolution. The issue has not been briefed at all in these two cases, and it will not be fully briefed in *Maurras Trust* until early April. Having reviewed Defendants' lengthy motion to dismiss in *Maurras Trust*, the court can say without any hesitation or doubt that it would be far more arduous to resolve the demand futility issue in these cases than it has been to resolve the *Grable* issue. *See Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 6, 2006) (noting that the demand futility "analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction"); *Lerner ex rel. Citigroup Inc. v. Prince*, 945 N.Y.S.2d 520, 530 (N.Y. Sup. Ct. 2012) (noting that Delaware's demand futility test "requires a fact-intensive determination as to whether the pleadings allege a lack of independence or disinterestedness of a majority of the directors sitting at the time of the commencement of the derivative claim at issue"). True, it is likely that this court ultimately will have to decide a similar if not identical demand futility issue in *Maurras Trust*. But the fact that there is a third Accretive Health derivative action pending before the undersigned judge is pure serendipity, and therefore is of insufficient moment to deprive Goodwin and Haith of the "consideration ordinarily accorded the plaintiff's choice of forum." *Sinochem*, 549 U.S. at 436.

In the end, because the "court can readily determine that it lacks jurisdiction over the cause …, the proper course" is "to dismiss on that ground." *Ibid*.

### III. Whether Attorney Fees and Costs Should Be Awarded Under 28 U.S.C. § 1447(c)

The removal statute provides that "[a]n order remanding a case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). Plaintiffs request attorney fees and costs under that provision. Doc. 17 (12

C 6781) at 8-9; Doc. 15 (12 C 6798) at 14-16. The Supreme Court has held that "the standard for awarding fees [under § 1447(c)] should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005).

In another *Grable* case where the plaintiff sought fees and costs under § 1447(c) upon remand, this court wrote that "[t]he Seventh Circuit recently described *Grable* as 'one of those cases in which the Supreme Court seems shy about taking a definite stand.' The governing jurisdictional standard is flexible enough, and the body of governing precedent thin enough, that it cannot be said that [the defendant] acted unreasonably in removing this case to federal court." *Navistar Int'l Corp. v. Deloitte & Touche LLP*, 837 F. Supp. 2d 926, 933 (N.D. Ill. 2011) (quoting *Samuel C. Johnson 1988 Trust v. Bayfield Cnty.*, 649 F.3d 799, 801 (7th Cir. 2011)). The Supreme Court exhibited no such shyness in *Gunn*, taking a definite stand on the "substantial" element of *Grable* jurisdiction. A defendant who removes a suit like Goodwin's and Haith's suits after *Gunn* might be said to have acted unreasonably. But Defendants did not have the benefit of *Gunn* when they filed their notices of removal, and *Gunn* itself recognized that some lower courts had interpreted *Grable*'s "substantial issue" requirement to refer to the federal issue's importance to the parties as opposed to the federal system as a whole, in the manner Defendants interpreted it here. *Gunn*, slip op. at 8 (citing *Air Measurement Techs., Inc. v. Akin Gump Strauss Hauer & Feld, L.L.P.*, 504 F.3d 1262, 1272 (Fed. Cir. 2007) ("the issue is substantial, for it is a necessary element of the malpractice case")). Given the unsettled state of

16

the law when Defendants removed these cases, it cannot be said that they lacked an objectively reasonable basis for the removal.

Perhaps recognizing this, Goodwin argues that "Defendants have acted unreasonably in failing to heed this Court's pronouncement in *Navistar*." Doc. 31 (12 C 6798) at 19. In other words, Goodwin maintains that because removal was improper under the analysis of *Grable* set forth in *Navistar*, the removal was objectively unreasonable. That argument, more than any other that has been made in these cases, is wholly without merit. A district court decision has no precedential weight. *See Wirtz v. City of S. Bend*, 669 F.3d 860, 863 (7th Cir. 2012). A party does not act in an objectively unreasonable manner simply by taking a position contrary to the position articulated by a single district judge in a single (necessarily) non-precedential opinion.

## Conclusion

For the foregoing reasons, Plaintiffs' motions to remand are granted. These cases are remanded to the Circuit Court of Cook County, Illinois. Plaintiffs' requests for attorney fees under 28 U.S.C. § 1447(c) are denied.

March 1, 2013

United States District Judge